Argued and submitted August 21, 2019; reversed and remanded as to BOLI's conclusion that Kaiser, Mitchell, and Struhar aided and abetted sexual harassment and were joint and severally liable, otherwise affirmed May 18, 2022

FREHOO, INC.,
dba Stars Cabaret & Steak House; and
Randy Kaiser, Todd Mitchell, and Jeff Struhar,
individually under ORS 659A.030(1)(g),
*Petitioners,*

*and*

Pamela COLBURN et al.,
*Respondents below,*

*v.*

BUREAU OF LABOR AND INDUSTRIES
OF THE STATE OF OREGON,
*Respondent.*

Oregon Bureau of Labor and Industries
3716; A166457

510 P3d 888

Petitioners, an adult entertainment establishment and three of its owner operators, Kaiser, Mitchell, and Struhar, appeal from a final order of the Bureau of Labor and Industries (BOLI), which held petitioners liable for subjecting AP2, a 15-year-old victim of sex trafficking, to sex discrimination in violation of ORS 659A.030(1)(b). BOLI concluded that AP2's working conditions at Frehoo constituted a hostile working environment, and that Frehoo was liable for those conditions because it knew or should have known that AP2 was a minor and should have taken steps to prevent or correct her hiring. BOLI also held the owner operators liable under ORS 659A.030(1)(g) for "aiding and abetting" the unlawful sexual harassment, and awarded $1 million in damages, with the owner operators jointly and severally liable. On review, petitioners challenge (1) the conclusions drawn in BOLI's final order, (2) the imposition of joint and several liability, and (3) the amount awarded to AP2. *Held*: First, the Court of Appeals concluded that BOLI did not err when it found Frehoo liable for sexual harassment. The court observed that the sexual exploitation of a child is severe and abusive by its very nature and pointed to substantial evidence in the record that Frehoo knew or should have known that AP2 was underage. Next, the court concluded that BOLI erred when it found Kaiser, Mitchell, and Struhar liable under an "aiding and abetting" theory. The court concluded that BOLI failed to grapple with the statutory text and context of ORS 659A.030(1)(g), and instead errantly relied upon the language of a previous agency decision to define "aiding and abetting." Finally, the court rejected petitioners' argument that BOLI's damages award was excessive but expressed no opinion as to the imposition of joint and severable liability.

Reversed and remanded as to BOLI's conclusion that Kaiser, Mitchell, and Struhar aided and abetted sexual harassment and were jointly and severally liable; otherwise affirmed.

Andrew Altschul argued the cause for petitioners. Also on the briefs were Courtney Angeli, Angela Ferrer, and Buchanan Angeli Altschul & Sullivan LLP.

Jona J. Maukonen, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Mooney, Presiding Judge, and James, Judge, and DeHoog, Judge pro tempore.

JAMES, J.

Reversed and remanded as to BOLI's conclusion that Kaiser, Mitchell, and Struhar aided and abetted sexual harassment and were joint and severally liable; otherwise affirmed.

DeHoog, J. pro tempore, concurring in part, dissenting in part.

**JAMES, J.**

Frehoo, Inc., operates an adult entertainment establishment where women dance nude for patrons. Frehoo hired AP2[1]—a 15-year-old victim of child sex trafficking—as a dancer. During her time as a dancer for Frehoo, the men who paid AP2 to perform VIP dances were bigger and older than her and were consuming alcohol. Some customers touched her and tried to get her to sit on their laps. Some tried to get their hands inside her underwear and tried to get her to touch them inside of their pants. She tried to stop the men from doing those things by telling them that it is not allowed and to let her just do her dance. It was hardest to deal with "drunk" or "tipsy" customers. AP2 felt disgusted during the VIP dances and had to ignore her feelings to get through the dances.

Following a lengthy investigation and litigation, the Bureau of Labor and Industries (BOLI) entered an order holding Frehoo, and three of its owners (owner respondents) liable for subjecting AP2 to sex discrimination in violation of ORS 659A.030(1)(b).[2] Among other things, BOLI concluded that (1) AP2's working conditions at Frehoo constituted a hostile working environment because AP2's age rendered her incapable of consenting either to being watched as she danced nude or to working conditions that included having customers touch or attempt to touch her inappropriately as she danced, and (2) Frehoo was liable for those conditions because it knew or should have known that AP2 was a minor and should have taken steps to prevent or correct the hiring of underage dancers.

BOLI further determined that three of Frehoo's individual owners (respondents Kaiser, Mitchell, and Struhar) were liable under ORS 659A.030(1)(g) for "aiding and abetting" the unlawful sexual harassment. To remedy that conduct and compensate AP2, BOLI awarded $1 million in

---

[1] The designation AP stands for "aggrieved person." As noted below, the original complaint in this case involved two aggrieved persons—AP1 and AP2. Only conduct related to AP2 remains at issue.

[2] Many of the statutes and rules cited in this opinion have been amended since the events giving rise to this case. Those amendments have no bearing on our analysis of the issues presented in this case. Unless otherwise noted, we cite the current versions throughout.

damages, with owner respondents being held jointly and severally liable. BOLI also ordered respondents to cease and desist the unlawful conduct.

On review, respondents raise four assignments of error, contending that BOLI erred in: (1) finding Frehoo liable for sexual harassment under ORS 659A.030(1)(b); (2) finding owner respondents liable under an "aiding and abetting" theory pursuant to ORS 659A.0030(1)(g); (3) "failing to ensure that [respondents] were afforded due process under the law"; and (4) awarding AP2 $1,000,000 in damages and imposing joint and several liability. We reject respondents' third assignment of error without discussion. With regard to the first and second assignments, for the reasons discussed below, we affirm BOLI's order as it applied to Frehoo, but reverse and remand as to Frehoo's individual owners, Kaiser, Mitchell, and Struhar. With regard to the fourth assignment, we reject Frehoo's challenge that the damages award is excessive, or lacks substantial evidence and reason; however, in light of our disposition as to Kaiser, Mitchell, and Struhar, we need not reach and express no opinion as to Frehoo's arguments regarding the applicability of joint and several liability.

Because respondents do not challenge BOLI's findings of fact on review, we take the facts from BOLI's final order. *See Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 134, 903 P2d 351 (1995), *abrogated on other grounds by State v. Hickman/Hickman*, 358 Or 1, 24, 358 P3d 987 (2015) (unchallenged factual findings are the facts for purposes of judicial review of an administrative agency's final order).

Frehoo, an Oregon business corporation, was owned and operated by Stars Cabaret and Steakhouse in Beaverton for about 20 years.[3] (Frehoo filed for bankruptcy in the summer of 2016.) Frehoo was an adult entertainment club featuring female entertainers who performed nude dancing.

---

[3] In this opinion, unless otherwise noted or apparent from the context, "Frehoo" refers both to the corporate entity and to the Stars Cabaret and Steakhouse in Beaverton. Other adult entertainment clubs in Oregon use the "Stars" business name; those clubs are owned by corporate entities separate from Frehoo and are not part of these proceedings.

The club served food and alcohol, and it sought to attract "high-end clientele." Owner respondents Mitchell, Kaiser, and Struhar owned shares of corporations that themselves had ownership interests in Frehoo and other Stars entertainment clubs.

Frehoo was an "erotic" and "sexually charged" business. Dancers performed on stage for two songs at a time; they were expected to remove either their top or bottom clothing by the end of the first song and to be fully nude by the end of the second. Dancers would also perform private dances in a "VIP lounge" for customers who paid for them, sit and chat with customers, and drink alcoholic beverages that customers paid for. Finally, customers could pay for a dancer to be removed from the stage rotation and spend her shift with the customer (referred to as being "bought off the floor"). The VIP lounge consisted of several chairs separated by sheer black curtains, and the lighting was dimmer there than in the rest of the club. There was a podium next to the lounge entrance where a security guard usually was stationed.

In addition to dancers, Frehoo employed a general manager, shift managers, security guards, bartenders, waitresses, cooking staff, DJs, and, during busy times, "door girls," who greeted and checked the identifications of customers as they entered. General managers "were responsible for everything that happened in the club." Among other responsibilities, a security guard or a manager was expected to walk a dancer to her car at the end of her shift.

At the time of the events giving rise to BOLI's complaint, Frehoo had a sexual harassment policy posted in the dancers' dressing room and in other areas of the club. Posters with information and warnings about human trafficking were also posted in the club. At least one of owner respondents had interacted with "Club Operators Against Sex Trafficking" (COAST), an organization that provides adult entertainment clubs training and information on recognizing sex trafficking.

Frehoo gave new dancers a packet of written policies; other rules were sometimes explained verbally at the

time of hiring. Among other things, Frehoo's rules prohibited prostitution and touching of dancers. If a customer violated the "no-touching" rule, the dancer was expected to give the customer a "friendly warning" to stop. Security guards and managers also could intervene if a customer violated the rule, and violators were potentially subject to being banned from the club.

In December 2013, a Stars employee, Toth, was arrested and, following a guilty plea, was convicted of several sexual offenses, including promoting prostitution. Toth had been Frehoo's general manager from 2011 to 2012 and, at the time of his arrest, was general manager of the Stars Bridgeport club. In connection with those charges, Toth admitted to having arranged for a 13-year-old girl (AP1) to perform sexual acts in exchange for money for Frehoo's customers on Frehoo's premises. He had also arranged for three dancers to leave Frehoo's premises with customers. Frehoo terminated Toth's employment immediately after his arrest, and he is currently serving a 15-year prison sentence for his crimes.

After Toth's arrest, Frehoo hired a private investigator and ultimately determined that it did not have a prostitution problem at the club, just a manager "that was off the rails." Nonetheless, Frehoo implemented a new policy requiring two managers to examine a new dancer's identification and sign off on it. BOLI found, however, that the policy was not consistently followed.

On August 14, 2014, AP2 auditioned to work as a dancer at Frehoo. At the time, AP2 was 15 years old and being sexually trafficked by her abuser, Curry, who had found her at a bus stop after she ran away from a drug treatment facility. Curry had subsequently forced AP2 to have sex with him, trained her to be an exotic dancer, and purchased her a counterfeit state-identification card. The ID card that Curry gave AP2 showed a birthdate of December 5, 1992, not her actual birthdate. AP2 used that ID card when she applied for work at Frehoo and other clubs. There were significant visual indicators that the identification was questionable. Curry drove AP2 to clubs for auditions, dropped her off at work, and picked her up after her shifts.

When AP2 arrived at Frehoo for her audition, she was directed to a manager. She presented herself as an experienced dancer. She changed clothes in the dancers' dressing room and then auditioned on stage. She removed both her top and bottom articles of clothing and was fully nude at the end of the audition. After her audition, a second manager asked to see AP2's ID card and made a copy of it. He also gave AP2 some paperwork, which she quickly signed, but he did not explain the rules to her. When AP2 arrived for her first shift, a security guard showed her around but, like the second manager, did not explain any rules to her.

Between August 14 and August 22, 2014, AP2 danced nude at Frehoo about seven times, using the stage name "Isis." Each time that AP2 worked, Curry dropped her off and picked her up in the Frehoo parking lot. During each shift, AP2 danced on stage. She also performed VIP dances, each lasting the length of one song. On a busy night, AP2 performed about 10 VIP dances; on a slower night, five or six. The more VIP dances AP2 performed, the more money she made. As to the VIP dances, BOLI found that "[s]ome customers touched [AP2] and tried to get her to sit on their laps. Some tried to get their hands inside her underwear and tried to get her to touch them inside of their pants." AP2 tried telling them that touching was not allowed and to let her do her dance. She did not call for security because she thought that she would not be asked to perform VIP dances if she complained. She generally did not complain about the conduct she experienced at Frehoo, because she did not believe it would help. During her shifts, AP2 also "worked the floor," trying to get customers to pay for a VIP dance. Most of AP2's shifts lasted eight or nine hours, but one night she worked 12 hours.

AP2 felt uncomfortable dancing nude on stage; "she saw customers looking at her and felt like they were thinking disgusting, sexual things about her. She also saw a 'curly haired' manager and a 'bald bouncer' watch her dance, which made her feel awkward." During the VIP dances, AP2 "felt disgusted" and "had to ignore her feelings" to get through them. "She knew that she had to be nude and act seductive

in front of random people, including 'creepy people' who she felt violated her rights and grabbed her. *** She felt like a 'sex robot' doing favors and dances." AP2 thought she had to perform at Frehoo to please Curry.

Shortly after AP2 began dancing at Frehoo, a bartender recognized her from a missing-child notice posted on Facebook. The bartender showed the posting to her manager the same day; she also called Mitchell. Mitchell then called Herkenrath, the general manager of Frehoo at the time, to confirm that the missing child was working there. After Herkenrath confirmed that she was working at Frehoo, Mitchell told him to call a detective. The detective responded by requesting copies of AP2's ID and her paperwork, which he picked up from the club on August 26. He then attempted to contact AP2 on her cellphone, pretending to be a manager at Frehoo and asking her to come in to work a shift. AP2 stopped performing at Frehoo after she started receiving the messages asking her to come to work. (Curry had apparently become suspicious of the phone calls and told AP2 that she was not to go back.) The detective then discovered that a dancer using the name "Isis" had auditioned and was scheduled to work at another adult entertainment club in the area. The police later arrested Curry when he dropped AP2 off at the other club, and AP2 was ultimately reunited with her mother.

BOLI's commissioner subsequently filed a complaint under ORS 659A.825 in which he alleged that Frehoo had employed two individuals (AP1 and AP2) who were under the age of 16, and that the conditions of their employment constituted sexual harassment under OAR 839-005-0030 and therefore violated ORS 659A.030(1)(b). BOLI also alleged that owner respondents had violated ORS 659A.030(1)(g) by aiding and abetting Frehoo in the commission of those unlawful employment practices. The formal charges sought damages of $4 million each for the "emotional and physical suffering" of AP1 and AP2. The charges involving AP1 were later settled.

After a hearing spanning 15 days, an administrative law judge (ALJ) issued a proposed order. Both BOLI and respondents filed exceptions, and the Deputy Commissioner

ultimately issued the final order that is the subject of this judicial review. As discussed in more detail below, the final order concluded that Frehoo was liable for sexual harassment of AP2 in violation of ORS 659A.030(1)(b), OAR 839-005-0021, and OAR 839-005-0030(1)(b), (5), and (7);[4] that owner respondents aided and abetted the unlawful sexual harassment under ORS 659A.030(1)(g) and were jointly and severally liable for the damages award; and that $1 million was an appropriate award to compensate AP2 for the mental and physical suffering she experienced as a result of the unlawful conduct.[5] BOLI also ordered respondents to cease and desist further violations of law related to sex discrimination and sexual harassment in the workplace.

With those facts in mind, we turn to the legal framework that governs our analysis, beginning with our standard of review. In their first assignment of error, respondents assert that BOLI erred in finding Frehoo liable for sexual harassment under either a supervisor or nonemployee (customer) harassment theory, because, in respondents' view, BOLI applied an incorrect legal standard. We review the question whether BOLI erroneously interpreted the applicable law for legal error, ORS 183.482(8)(a). Respondents also argue that BOLI's final order lacks substantial evidence, ORS 183.482(8)(c). Where a petitioner argues that an order lacks substantial evidence, we also review for substantial reason—that is, we determine whether the agency's conclusions reasonably follow from the facts that it found. *Simpson v. Board of Parole*, 237 Or App 661, 663, 241 P3d 347 (2010).

---

[4] BOLI's order also references OAR 839-005-0030(1)(a)(A) as an additional basis for its conclusion that Frehoo subjected AP2 to sexual harassment. That rule provides that sexual harassment includes "[u]nwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature when such conduct is directed toward an individual because of that individual's sex and *** [s]ubmission to such conduct is made either explicitly or implicitly a term or condition of employment[.]" However, the order does not address that provision, nor do the parties argue it on review. We therefore do not consider it further.

[5] The final order differed from the ALJ's proposed order in two significant respects: First, the ALJ had found that Frehoo was not liable under OAR 839-005-0030(5) (liability for supervisor harassment). Second, the ALJ had found that owner respondents were not liable under ORS 646.030(1)(g) as aiders and abettors of the unlawful conduct. The final order reversed both of those rulings.

Turning to the merits, ORS chapter 659A governs workplace discrimination. Under ORS 659A.030(1):

"It is an unlawful employment practice:

"* * * * *

"(b)   For an employer, because of an individual's * * * sex * * * to discriminate against the individual in compensation or in terms, conditions or privileges of employment."

The legislature has authorized the BOLI commissioner to enforce the provisions of ORS chapter 659A by filing complaints with BOLI if the commissioner "has reason to believe that any person has committed an unlawful practice[.]" ORS 659A.825 (authorizing commissioner to file complaint in the manner specified under ORS 659A.820); *see also* ORS 659A.820 (permitting a "person claiming to be aggrieved by an unlawful practice" to file complaint with BOLI). BOLI also has broad rulemaking authority as may be "required to carry out the purposes of" ORS chapter 659A. ORS 659A.805(1)(e) (authorizing issuance of reasonable rules for those purposes).

BOLI has issued workplace-discrimination rules under that authority establishing that sexual harassment is a form of unlawful discrimination on the basis of sex under ORS 659A.030. OAR 839-005-0030(1) (implementing ORS 659A.030); OAR 839-005-0021(2) ("Discrimination because of sex includes sexual harassment[.]"); *Fred Meyer, Inc. v. BOLI*, 152 Or App 302, 307, 954 P2d 804 (1998) ("By administrative rule, BOLI has determined that sexual harassment is a form of gender discrimination."). In that regard, BOLI's approach is consistent with federal case law construing Title VII of the 1964 Civil Rights Act, 42 USC § 2000e-2(a)(1), in which the general prohibition against sex discrimination in employment has similarly been held to encompass sexual harassment. *Meritor Savings Bank, FSB v. Vinson*, 477 US 57, 106 S Ct 2399, 91 L Ed 2d 49 (1986); *see also H. K. v. Spine Surgery Center of Eugene*, 305 Or App 606, 611, 470 P3d 403 (2020), *rev den*, 367 Or 826 (2021) (Oregon courts look to federal cases construing Title VII of the Federal Civil Rights Act for guidance in construing ORS 659A.030,

because its predecessor, *former* ORS 659.030 (1993), *renumbered as* ORS 659A.030 (2001), was modeled after that act).

In turn, BOLI has defined "sexual harassment" in relevant part, as follows:

> "Sexual harassment is unlawful discrimination on the basis of sex and includes the following types of conduct:
>
> "* * * * *
>
> "(b)   Any unwelcome verbal or physical conduct that is sufficiently severe or pervasive to have the purpose or effect of unreasonably interfering with work performance or creating a hostile, intimidating or offensive working environment."

OAR 839-005-0030(1). In this case, BOLI determined that AP2 was subject to "hostile environment" sexual harassment under that rule, which also tracks federal law. *See, e.g.*, *Fuller v. Idaho Dept. of Corr.*, 865 F3d 1154, 1161 (9th Cir 2017), *cert den*, ___ US ___, 138 S Ct 1345, 200 L Ed 2d 514 (2018) (Title VII prohibition against discrimination on the basis of sex "extends to the creation of a hostile work environment that 'is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" (Quoting *Harris v. Forklift Sys., Inc.*, 510 US 17, 21, 114 S Ct 367, 126 L Ed 2d 295 (1993).)).

To prove the existence of a hostile working environment, BOLI or another complainant must establish that "1) [the employee] was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) the conduct was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *See Fuller v. City of Oakland*, 47 F3d 1522, 1527 (9th Cir 1995) (quoting *Ellison v. Brady*, 924 F2d 872, 875-76 (9th Cir 1991)). What constitutes a "hostile, offensive or intimidating working environment," is determined by applying a "totality of the circumstances" test. *Fred Meyer, Inc.*, 152 Or App at 309 (citing *Holien v. Sears, Roebuck and Co.*, 298 Or 76, 89, 689 P2d 1292 (1984). The working environment must subjectively and objectively be perceived as abusive. *Harris*, 510 US at 21-22 (so stating for purposes of Title VII); *Fred Meyer, Inc.*, 152 Or

App at 307 (we apply an objective standard—"that is, we determine whether a reasonable person would arrive at that conclusion"—in evaluating whether conduct has created a hostile working environment under state statute). More specifically, whether the workplace is objectively hostile is determined "from the perspective of a reasonable person *with the same fundamental characteristics*" as the plaintiff. *Fuller*, 47 F3d at 1527 (emphasis added). BOLI has adopted that standard by rule:

> "The standard for determining whether harassment based on an individual's sex is sufficiently severe or pervasive to create a hostile, intimidating or offensive working environment is whether a reasonable person in the circumstances of the complaining individual would so perceive it."

OAR 839-005-0030(2).

The standards of sexual harassment in the workplace do not change when, as in the context of this case, the work itself is of a sexual nature. Exotic dancers do not lack protection against sexual harassment in the workplace. *See Clark v. Top Shelf Entm't, LLC*, 316CV00144MOCDSC, 2017 WL 971051 at *4 (WDNC Mar 13, 2017) (holding that exotic dancers "have protections at the workplace, including protections from sexual harassment (especially by their employers), sexual assault, and other sexual misconduct"); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 US 75, 81, 118 S Ct 998, 140 L Ed 2d 201 (1998) ("[The] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field— even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office.").

If it is established that sexual harassment has occurred, an employer may be held liable for the harassment on any of the grounds set forth in OAR 839-005-0030(3) to 839-005-0030(9). Here, BOLI's order found liability based on OAR 839-005-0030(5) (supervisor harassment) and OAR

839-005-0030(7) (nonemployee harassment).[6] With regard to the former, subsection (5) provides:

> "When sexual harassment by a supervisor with immediate or successively higher authority over an individual is found to have occurred, but no tangible employment action was taken, the employer is liable if:
>
> "(a)   The employer knew of the harassment, unless the employer took immediate and appropriate corrective action[; or]
>
> "(b)   The employer should have known of the harassment. The division will find that the employer should have known of the harassment unless the employer can demonstrate:
>
> "(A)   That the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior; and
>
> "(B)   That the aggrieved person unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm."

OAR 839-005-0030(5).

Thus, if the person engaging in harassing behavior has supervisory authority over the aggrieved person, an employer will be liable if it is shown to have *known* of the harassment and to have failed to take "immediate and appropriate corrective action," or if the employer *should have known* of the harassment. As to the latter theory, OAR 839-005-0030(5)(b) effectively raises a presumption that the employer should have known unless it proves *both* that it "exercised reasonable care to prevent and promptly correct any sexually harassing behavior" *and* that the aggrieved person unreasonably failed to take available steps to avoid harm from the conduct.

As to harassment by a nonemployee, subsection (7) provides:

> "An employer is liable for sexual harassment by nonemployees in the workplace when the employer or the

---

[6] As noted above, 319 Or App at 551 n 3, we quote the current version of the rules. Subsequent to the events in this case, subsection (5) was amended to alter the terminology from "the complaining person" to the "aggrieved person." *Compare* OAR 839-005-0030 (Dec 30, 2013), *with* OAR 839-005-0030 (Aug 4, 2015). That change is immaterial to our analysis.

> employer's agents knew or should have known of the conduct unless the employer took immediate and appropriate corrective action. In reviewing such cases the division will consider the extent of the employer's control and any legal responsibility the employer may have with respect to the conduct of such non-employees."

OAR 839-005-0030(7). Although subsection (7) renders employers liable for harassing conduct by certain nonemployees when the employer knew or should have known of the conduct (and failed to take immediate and appropriate corrective action), that subsection does not expressly impose a burden on employers to avoid the finding that they "should have known" that sexual harassment was occurring in the workplace. *See id*.

In this case, BOLI concluded that Frehoo was liable for sexual harassment of AP2 in violation of ORS 659A.030(1)(b) (discrimination on the basis of sex), OAR 839-005-0021 (sexual harassment is a form of discrimination because of sex), and OAR 839-005-0030(1)(b) (sexual harassment by creation of a hostile work environment), (5) (liability for supervisor conduct), and (7) (liability for nonemployee conduct). Beginning with Frehoo's liability for the sexual harassment of AP2 by customers—that is, nonemployees—OAR 839-005-0030(7), BOLI explained:

> "Frehoo earned revenue by hiring female entertainers who agreed to engage in conduct of a sexual nature. Due to AP2's age and her inability to consent, this conduct was unwelcome. Therefore, the key inquiry for this portion of the analysis is whether Frehoo 'knew or should have known' that she was only 15 years old and, thus, lacked the ability to consent."

BOLI concluded that (1) Frehoo should have known that AP2 was underage at the time she auditioned in light of Frehoo's awareness that sex trafficking is prevalent in the United States, Frehoo's knowledge that its former employee Toth had engaged in sex-trafficking in connection with AP1, and obvious defects in AP2's state-identification card; and (2) respondents had not taken immediate and appropriate action "to prevent the hiring and sexual harassment of underage dancers."

As to Frehoo's liability for sexual harassment by a supervisor, OAR 839-005-0030(5), BOLI applied similar reasoning. BOLI found that AP2 had been sexually harassed by her supervisors because "Frehoo's managers required AP2 to dance nude in front of supervisors, employees and customers as a condition of her employment" and AP2 "felt uncomfortable and awkward" when one manager "stared at her while she danced." Largely incorporating its analysis of Frehoo's liability for sexual harassment by its customers, BOLI concluded that Frehoo was also liable for AP2's harassment by her supervisors, noting that "Frehoo did not take reasonable care to prevent the harassment of underage women and, even if Frehoo had done so, it was not unreasonable for AP2, a 15-year-old girl, to fail to complain."

In its first assignment of error Frehoo argues that BOLI erred by

> "conclud[ing] that the act of working as an exotic dancer is *per se* offensive conduct that, if unwelcome, constitutes sexual harassment. * * * Liability under ORS 659A.030(1)(b), however, is based on *someone else's severe and pervasive conduct* that unreasonably interferes with an employee's work performance or creates a hostile work environment. One cannot harass herself by performing her job."

(Emphasis in original.) With regard to customers watching her perform nude, Frehoo argues that "[i]t is not severe or pervasive conduct, nor is it capable of altering the work environment; it *is* the work environment." (Emphasis in original.)

BOLI's legal analysis was not in error. Frehoo's reliance on the job itself, which entails nude dancing for customers, misses the essential element of BOLI's reasoning. BOLI did not conclude that the work of nude dancing itself constituted sexual harassment or a hostile work environment. Its point was that AP2, as a child, could not be lawfully employed in such work and that her perspective of the work environment must necessarily include consideration of the impact her age had on her experience of that work environment. We know that AP2 experienced the work and the environment in which the work was done, including customer responses to her dancing, as "unwelcome" because she

said that that was her experience. Frehoo does not dispute that. The work environment was objectively "unwelcome" to AP2 as a child because it involved sexually charged dancing that included the removal of her clothing on stage in front of paying customers and entertaining VIP customers in more intimate situations. Frehoo's argument that the work itself requires the conclusion that it cannot be objectively viewed as sexual harassment is simply not correct, and to the contrary, compels the opposite conclusion. AP2's employment as a nude dancer was objectively the sexual exploitation of a child.

As to severity, BOLI "examine[d] the conduct that AP2 experienced from the perspective of a 15-year-old girl in those circumstances." BOLI noted:

> "The men who paid AP2 to perform VIP dances were bigger and older than her; and were consuming alcohol. Some customers touched her and tried to get her to sit on their laps. Some tried to get their hands inside her underwear and tried to get her to touch them inside of their pants. She tried to stop the men from doing those things by telling them that it is not allowed and to let her just do her dance. It was hardest to deal with 'drunk' or 'tipsy' customers. She felt disgusted during the VIP dances and had to ignore her feelings to get through the dances."

As BOLI rationally explained, "a reasonable young woman of that age would have found the performance of nude dancing for older men to be sufficiently severe to create a hostile, intimidating and offensive working environment." BOLI further noted that AP2 had "explained how she was intimidated, humiliated and demeaned when the men touched her without her consent during private dances." And the conduct here was objectively severe for a person who could not consent to that conduct. As BOLI explained, "Frehoo's entertainers were subjected to conduct that in most workplaces would be unwelcome sexual harassment, yet it did not take necessary steps to make sure that it was hiring women who were old enough to consent to such conduct." There is simply no plausible argument that the sexual exploitation of a child isn't severe and abusive by its very nature. Accordingly, BOLI correctly identified that AP2's

age is the fulcrum of this case: it changes the fundamental nature of what occurred in the workplace.

Finally, the record contains substantial evidence to support BOLI's conclusion that Frehoo, as a corporation, knew or should have known that it was employing underage dancers generally, and that AP2 herself was underage. Frehoo had just recently, within the past year, not only employed a 13-year-old girl, but employed her trafficker. It knew it had a serious problem of child sex exploitation, perpetrated by its own employees, and that its current controls were inadequate. It then failed to make any changes—including failing to adopt identification machines, or even failing to enforce its own policies. As to AP2 specifically, a cursory visual inspection of her ID reveals that is obviously fake and her testimony bolsters that fact.[7]

Turning to the second assignment of error, BOLI determined that Frehoo's owners—Kaiser, Mitchell, and Struhar—aided and abetted in the sexual harassment of AP2, as provided in ORS 659A.030(1)(g). That statute makes it an unlawful employment practice "[f]or any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so." ORS 659A.030(1)(g).

However, rather than adjudicating Kaiser, Mitchell, or Struhar's actions against that statutory landscape, BOLI quoted an agency decision finding that aiding and abetting means "to help, assist, or facilitate the commission of

---

[7] The dissent contends that, "[e]ven though BOLI's earlier analysis separately considered whether the conduct of Frehoo's customers had been sufficiently severe or pervasive to create hostile working conditions, BOLI's analysis of Frehoo's *liability* for that conduct omitted that consideration—that is, whether Frehoo *knew or should have known* that its customers' conduct created such conditions." 319 Or App at 572 (DeHoog, J. pro tempore, concurring in part, dissenting in part) (emphasis in original). We do not view BOLI as having omitted that consideration but, rather, as having not repeated the obvious and necessary conclusion that it had already made express in its earlier analysis. If Frehoo should have known about AP2's age, it necessarily should have known that AP2 being watched by customers while she danced nude had created hostile working conditions for that child. Frehoo was a strip club; if it should have known that a child was dancing nude for its customers in the ordinary course of business, there is no scenario in which that unwelcome conduct would not be sufficiently severe or pervasive to create a hostile working environment for purposes of Oregon's workplace discrimination laws.

an unlawful employment practice[.]" *In the Matter of Cyber Center, Inc.*, 32 BOLI 11, 37 (2012). BOLI then concluded:

> "Because *the legislature* used three separate words in the statute ('help[,'] 'assist,' and 'facilitate'), the forum will examine and give effect to each word."

(Emphasis added.) But, of course, the legislature did *not* use those words.

What the Legislature has provided is that

> "[i]n the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."

ORS 174.010. BOLI, when engaged in its adjudicative function, is equally prohibited from inserting what has been omitted, nor omitting what has been inserted, by the legislature. BOLI's consideration of the matter, as it relates to Kaiser, Mitchell, or Struhar, failed to grapple with the actual statutory text or its context and instead relied solely on a dictionary meaning of a term that is not even in the statute. BOLI stated: "The most applicable definition of 'facilitate' is 'To make the occurrence of (something) easier; to render less difficult.' *Black's Law Dictionary* 708 (10th ed 2009)." That extremely broad meaning of "facilitate"—untethered from the text, context, and history of the statute—could encompass any act in the chain of events that somehow made the unlawful employment discrimination possible, no matter what the person knew or should have known about the consequences of the act. To the extent BOLI inserted an entirely new term into the statute, it erred.

Given the fundamental nature of BOLI's error in this case—applying the meaning of three terms (help, assist, and facilitate) that are not even in the statute—we do not further attempt to parse the meaning of ORS 659A.030(1)(g) or determine what types of "facilitation"—again, a term not in the statute—can give rise to liability under ORS 659A.030. Rather, because BOLI did not engage with the operative language of the statute, our proper remedy is to remand for

it to do so. *See, e.g.*, *Nakashima v. Board of Education*, 344 Or 497, 520, 185 P3d 429 (2008) ("Because the board applied the wrong legal test in its analysis, its analysis misses the mark. The board must reconsider this case—and reopen the record if necessary—pursuant to the 'reasonably necessary' test that ORS 659.850 requires, and it must make findings consistently with that test.").

Finally, as indicated previously, we reject Frehoo's argument that BOLI's damages award was excessive, or unsupported by substantial evidence or reason. We express no opinion as to Frehoo's arguments as to the imposition of joint and severable liability. Our disposition as to Kaiser, Mitchell, and Struhar necessitates a remand as to them, and the issue of joint and several liability may, or may not, arise again.

Reversed and remanded as to BOLI's conclusion that Kaiser, Mitchell, and Struhar aided and abetted sexual harassment and were joint and severally liable; otherwise affirmed.

**DeHOOG, Judge pro tempore,** concurring in part; dissenting in part.

Without a doubt, employing a 15-year-old child to dance nude in an adult establishment is abusive and intolerable conduct—indeed, the state legislature and the people of Oregon have seen fit to penalize such conduct with some of the harshest sentences available under the criminal law. *See* ORS 163.670 (defining crime of using a child in display of sexually explicit conduct; classifying offense as Class A felony); ORS 163.665(3)(f) (defining "[s]exually explicit conduct" to include "[l]ewd exhibition of sexual or other intimate parts"); ORS 137.690 (violation of ORS 163.670 is one of only four "[m]ajor felony sex crime[s]" carrying mandatory minimum sentence of 25 years' imprisonment for second offense).[1]

Similarly, there is no question that the Oregon Bureau of Labor and Industries (BOLI) has considerable

---

[1] The provisions now codified at ORS 137.690 were adopted through the initiative process as Ballot Measure 73 (2010).

responsibility and broad authority when it comes to work-place discrimination. *See* ORS chapter 659A.003 (purpose of ORS chapter 659A is "to encourage the fullest utilization of the available workforce by removing arbitrary standards *** and to ensure the human dignity of all people within this state and protect their health, safety and morals from the consequences of intergroup hostility, tensions and practices of unlawful discrimination of any kind[,]" including that based on sex); ORS 659A.800 (authorizing BOLI to "take all steps necessary" to eliminate and prevent unlawful employment practices); ORS 659A.805 (authorizing promulgation of reasonable rules required to carry out the purpose of ORS chapter 659A).

Finally, it is beyond reasonable dispute that, if Frehoo, its employees, or its customers were to subject Frehoo's dancers to sexual discrimination—including by subjecting them to sexual harassment—and BOLI were to establish that Frehoo knew or should have known that its dancers were being sexually harassed, Frehoo (and perhaps its principals or employees) would face potential liability under the applicable statutes and rules set out in the majority opinion, 319 Or App at 556-61 (setting out applicable legal framework). Notably, in that regard, liability for some of the conduct alleged in this case—such as unwanted touching in the "VIP lounge"—could be imposed as to any dancer subjected to it, not only as to those like AP2, who were too young to consent to that behavior by Frehoo's customers.

On that much, it appears, the majority and I would agree. And to the extent that the majority opinion capably lays out the applicable standards and the history of this case, its views coincide with mine. However, I part ways with the analysis in the majority opinion when, in evaluating Frehoo's challenge to BOLI's order, the majority—much like BOLI itself—unduly narrows its focus to AP2's age and her corresponding legal incapacity to work for Frehoo as a dancer, much less to consent to conduct that even Frehoo's adult employees would likely find offensive. *See id*. at 562-63 ("AP2's employment as a nude dancer was objectively the sexual exploitation of a child."); *id*. at 563-64 ("There is simply no plausible argument that sexual exploitation of a child isn't severe and abusive *by its very nature*. Accordingly,

BOLI correctly identified * * * AP2's age [as] the fulcrum of this case[;] it changes the fundamental nature of what occurred in the workplace." (Emphasis added.)).

In narrowing its focus in that manner—and, in particular, by focusing on whether AP2 had consented to being watched or touched, as opposed to whether Frehoo or its personnel knew or should have known the extent of AP2's victimization and how she subjectively experienced being watched as she danced—the majority appears to lose sight of the fact that the state chose to address this matter as a *workplace discrimination* case; that is, not as a tort case, where the focus might be on the harm that Frehoo's hiring practices foreseeably caused AP2, nor as a criminal case, in which merely employing AP2 to dance, if done with a culpable mental state, might have been a crime. Thus, the relevant inquiry in this case is whether Frehoo knew or should have known (within the meaning of the workplace-discrimination statutes and rules) that its employees or customers were subjecting AP2 to discriminatory conduct based on her sex, more specifically, sexual harassment. It is not the question that the majority opinion emphasizes: whether AP2 should have been hired to work for Frehoo in the first place. Clearly, she should not have been, and no one has ever contended otherwise.

By emphasizing an issue that is entirely beyond dispute, the majority opinion, in my view, gives insufficient attention to whether BOLI properly engaged in the relevant inquiry. In doing so, the majority fails to hold BOLI to the applicable standards of review: whether BOLI correctly applied the law and whether BOLI's order is supported by substantial evidence and reason. *See* 319 Or App at 558-59 (setting out those standards). It may be that, under a correct application of the law, BOLI's undisputed factual findings could support its ultimate conclusions. However, BOLI must rationally explain its reasoning in its order, which it cannot do if it is laboring under an incorrect understanding of what the law requires. And even if BOLI could reach the same conclusions without placing undue emphasis on AP2's legal incapacity to consent to *any* aspect of her work for Frehoo— an approach that the majority opinion does not consider— BOLI must do so itself. As a result, I would conclude that

BOLI's order must be reversed and remanded on that ground, in addition to the ground on which the majority relies in its opinion. Accordingly, I respectfully dissent.[2]

## DISCUSSION

The crux of respondents' first assignment of error is that BOLI incorrectly applied the law in finding Frehoo liable for sexual harassment under both a supervisor and non-employee (customer) harassment theory. As to both bases of liability, BOLI relied on a "hostile working environment" theory. That is, BOLI contended and ultimately concluded that Frehoo's employees and customers had subjected AP2 to unwelcome conduct of a sexual nature and that their conduct had been "sufficiently severe or pervasive to have the *** effect of *** creating a hostile, intimidating or offensive working environment." OAR 839-005-0030(1) (defining sexual harassment); *see also* 319 Or App at 557 (describing elements of a *prima facie* hostile-work-environment claim). As to each category—supervisor or customer—BOLI relied on physical conduct: Frehoo's employees and customers watching AP2 as she danced nude, and Frehoo's customers inappropriately touching or attempting to touch AP2 as she danced for them.

As the majority opinion notes, in determining what constitutes a "hostile, offensive or intimidating working environment," we apply a "totality of the circumstances" test. 319 Or App at 558-59. Under that test, the working environment must subjectively be perceived as abusive, and that perception must in turn be objectively reasonable. Importantly, whether the workplace is objectively hostile is determined "from the perspective of a reasonable person *with the same fundamental characteristics*" as the plaintiff. *Id*. BOLI's rules incorporate that standard:

> "The standard for determining whether harassment based on an individual's sex is sufficiently severe or pervasive to create a hostile, intimidating or offensive working

---

[2] I concur with the majority opinion insofar as it would reverse and remand BOLI's order in connection with respondents' second assignment of error, though I would reach that conclusion on different grounds. I likewise concur with the majority's disposition as to the remaining assignments of error.

environment is whether a reasonable person in the circumstances of the complaining individual would so perceive it."

OAR 839-005-0030(2).

Respondents contend that, in holding Frehoo liable in this case, BOLI unduly relied on AP2's age as a determinative factor. In their view, BOLI improperly reasoned that AP2's legal incapacity to consent to sexual conduct rendered her working environment "hostile" as a matter of law. For the reasons that follow, I agree that BOLI erred, if not for the exact reasons that respondents articulate.

Starting with BOLI's customer-based theory of liability, BOLI considered AP2's age at two points in evaluating the hostile-working-environment aspect of that claim. First, when determining whether the conduct of Frehoo's customers had been "unwelcome," BOLI reasoned that, because AP2 was a minor, having customers watch her dance nude was unwelcome as a matter of law because she lacked the legal capacity to consent to that conduct.[3] Second, when evaluating whether the evidence showed that unwelcome conduct to be sufficiently severe or pervasive to create a hostile working environment, BOLI "examine[d] the conduct that AP2 experienced from the perspective of a 15-year-old girl in those circumstances."

BOLI appears to have initially treated the inquiry as to whether the conduct of Frehoo's customers watching AP2 dance had been "unwelcome" separately from whether that conduct had been "sufficiently severe or pervasive" to create a hostile working environment. However, in both instances, it appears to have considered both AP2's subjective views and the objective reasonableness of those views. As to her subjective view that the conduct was unwelcome, BOLI noted that "AP2 credibly testified that this conduct was unwelcome." As to whether AP2's view was objectively reasonable, BOLI did not express its conclusion in terms of "objective reasonableness," but it appears to have reasoned that it was objectively reasonable for AP2 to view the conduct

---

[3] BOLI also found based on AP2's testimony that she considered that conduct to be "unwelcome." Respondents do not dispute that AP2 subjectively considered the conduct of Frehoo's customers to be unwelcome, and substantial evidence in the record supports BOLI's finding in that regard.

as unwelcome, because, as a matter of law, her age rendered her incapable of welcoming it. Respondents do not challenge BOLI's reasoning in that regard, and I see no basis to question that aspect of BOLI's order.

As noted, BOLI also considered AP2's age in determining that the customer conduct of watching her dance was sufficiently severe or pervasive to create a hostile working environment. Again, I *agree* with BOLI that AP2's age was a relevant factor in that assessment—in other words, that we view "the conduct AP2 experienced from the perspective of a reasonable 15-year-old girl in those circumstances." *See* OAR 839-005-0030(2) ("whether harassment based on an individual's sex is sufficiently severe or pervasive to create a hostile *** working environment [depends on] whether a reasonable person in the circumstances of the complaining individual would so perceive it"). And as the majority notes, BOLI explained in its order that "a reasonable young woman of that age would have found the performance of nude dancing for older men to be sufficiently severe to create a hostile, intimidating and offensive working environment." BOLI further observed that AP2 had "explained how she was intimidated, humiliated and demeaned when the men touched her without her consent during private dances," thereby reflecting its finding that AP2 subjectively found her working conditions to be hostile. I agree with the majority that that finding is amply supported by evidence in the record, and again respondents do not contend otherwise.

Thus, up to that point in its analysis, BOLI's approach appears reasonable, as does its corresponding conclusion in the order that it had made out a *prima facie* case of sexual harassment under the applicable law. However, in my view, BOLI's order falters when BOLI relies on those preliminary determinations and proceeds to hold Frehoo liable for the hostile environment that its customers created. BOLI's reasoning on that point was that:

> "Frehoo earned revenue by hiring female entertainers who agreed to engage in conduct of a sexual nature. Due to AP2's age and her inability to consent, this conduct was unwelcome. Therefore, the key inquiry for this portion of the analysis is whether Frehoo 'knew or should have

known' that she was only 15 years old and, thus, lacked the ability to consent."

In other words, in determining Frehoo's liability for AP2's sexual harassment—as opposed to whether AP2 had been subjected to it—BOLI considered only whether Frehoo knew or should have known that the conduct of its customers was unwelcome, a question BOLI answered affirmatively in light of its conclusion that AP2's age rendered the conduct unwelcome *per se*. Even though BOLI's earlier analysis separately considered whether the conduct of Frehoo's customers had been sufficiently severe or pervasive to create hostile working conditions, BOLI's analysis of Frehoo's *liability* for that conduct omitted that consideration—that is, whether Frehoo *knew or should have known* that its customers' conduct created such conditions. That, as I explain below, was in my view an error. Further, it appears to me that that erroneous approach ultimately drove BOLI's determination that Frehoo was liable for its customers' conduct towards AP2. Thus, unlike the majority, I would conclude that BOLI's order lacks substantial evidence and reason in support of that determination.

In framing the analysis as it did, BOLI effectively transformed AP2's age from a factor to be considered in deciding whether a hostile working environment exists—that is, whether it has established a *prima facie* case of workplace discrimination—to one determinative of liability. But for Frehoo to be held liable for the hostile working conditions created by its customers' conduct, BOLI was required to establish that Frehoo knew or should have known that its customers were subjecting AP2 to sexual harassment, and not merely that Frehoo knew or should have known that AP2 was under the age of consent. *See* OAR 839-005-0030(1)(b) (sexual harassment includes "unwelcome verbal or physical *conduct* that is sufficiently severe or pervasive to have the purpose or effect of unreasonably interfering with work performance or creating a hostile, intimidating or offensive working environment" (emphasis added)); OAR 839-005-0030(7) ("An employer is liable for sexual harassment by non-employees in the workplace when the employer or the employer's agents knew or should have known of *the conduct* unless the employer took immediate and appropriate

corrective action." (Emphasis added.)); OAR 839-005-0030
(5)(a)(b) (employer liable if it "knew of *the harassment*,
unless the employer took immediate and appropriate cor-
rective action" or the employer "should have known of *the
harassment*" (emphases added)); OAR 839-005-0030(5)(b)(A)
(employer "should have known of *the harassment* unless it
can demonstrate [t]hat the employer exercised reasonable
care to prevent and promptly correct any *sexually harassing
behavior*" (emphases added)).

　　　　BOLI's approach to determining Frehoo's liabil-
ity for the conduct of its customers therefore improperly
curtailed the analysis. By describing the relevant inquiry
underlying Frehoo's potential liability for its customers' con-
duct as "whether Frehoo 'knew or should have known' that
[AP2] was only 15 years old," BOLI's final order can at best
be understood as considering only whether Frehoo knew
or should have known that its customers were engaging in
*unwelcome* conduct, and not whether Frehoo knew or should
have known that conduct constituting sexual harassment
was taking place; that is, that Frehoo knew or should have
known that the unwelcome conduct of its customers was
sufficiently severe or pervasive to create a hostile working
environment. Thus, even if BOLI's earlier discussion of the
"severe or pervasive" standard can be understood to prop-
erly consider whether AP2 was subject to sexual harassment
in the first place, BOLI's later discussion of Frehoo's liabil-
ity for that harassment omits a critical component of the
analysis by limiting the inquiry to whether Frehoo knew
or should have known that AP2 was underage. That, in my
view, was erroneous. Although AP2's age is properly a factor
in the analysis, it is not, as BOLI's analysis suggests, the
conclusive factor.[4]

　　　　Rather than recognizing BOLI's error in that regard,
the majority echoes BOLI's flawed reasoning. First, the

_____

　　[4] To the extent that BOLI contends that its interpretation of the rule is enti-
tled to deference, I would reject that argument. BOLI's construction is inconsis-
tent with federal law and the rule itself; therefore, it is not entitled to deference.
*Gafur v. Legacy Good Samaritan Hospital*, 344 Or 525, 537, 185 P3d 446 (2008)
(We "defer[] to [the] agency's interpretation * * *, as long as that interpretation [is
not] inconsistent with the wording of the rule itself, or with the rule's context, or
with any other source of law.").

majority opinion, as noted, quotes BOLI as having "ratio-nally explained [that] 'a reasonable young woman of that age would have found the performance of nude dancing for older men to be sufficiently severe to create a hostile, intim-idating and offensive working environment.'" 319 Or App at 563. But then, rather than articulating BOLI's basis for con-cluding that Frehoo knew or should have known that AP2 subjectively viewed having customers watch her dance to be sufficiently severe or pervasive to create a hostile work envi-ronment, the majority—like BOLI—shifts its focus back to what Frehoo knew or should have known about AP2's age:

> "Finally, the record contains substantial evidence to support BOLI's conclusion that Frehoo, as a corporation, knew or should have known that it was employing under-age dancers, generally, and that AP2 herself was under-age. Frehoo had just recently, within the past year, not only employed a 13-year-old girl,[5] but [also] employed her trafficker. It knew it had a serious problem of child sex-[ual] exploitation, perpetrated by its own employees, and that its current controls were inadequate. It then failed to make any changes—including failing to adopt identifica-tion machines, or even failing to enforce its own policies. As to AP2 specifically, a cursory visual inspection of her ID reveals that is obviously fake and her testimony bolsters that fact."[6]

319 Or App at 564. At best, the majority opinion can be under-stood to reason that, because Frehoo *should* have known that AP2 was not 18, Frehoo also *should* have known that she viewed her working conditions to be sufficiently severe or pervasive so as to create a hostile workplace. And what-ever the merits of that reasoning might be, it is the reason-ing of the majority, whereas it is BOLI's reasoning that the order must disclose. Here that reasoning is absent.

　　　　Given that absence of a reasoned explanation other-wise, I agree with respondents that BOLI's order relies on

---

[5] Contrary to the majority's apparent understanding, I do not understand BOLI to have found—or the record to support the finding—that Frehoo ever employed AP1, who presumptively is the 13-year-old at issue.

[6] It is not clear *whose* "cursory visual inspection" the majority is referring to. The testimony before the administrative law judge identified various technical deficiencies with AP2's ID card, but BOLI did not find that the ID was "obviously fake."

an incorrect understanding of the law in holding Frehoo liable for its customers' conduct in watching AP2 dance nude. For much the same reason, BOLI's final order also lacks substantial reason in support of that conclusion—that is, it fails to "articulate a rational connection between the facts of the case and [its] legal conclusion." *Endres v. DMV*, 255 Or App 226, 229, 297 P3d 505 (2013). That, in my view, is a sufficient basis to reverse and remand BOLI's order. *See* ORS 183.482(8)(a)(B) ("If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall * * * [r]emand the case to the agency for further action under a correct interpretation of the provision of law."); ORS 183.482(8)(c) ("The court shall set aside or remand the order if the court finds that the order is not supported by substantial evidence in the record.").

Before concluding, I turn briefly to the remaining bases on which BOLI imposed principal liability on Frehoo, namely, its customers' conduct in violating the no-touching rule and its own employees' conduct in watching AP2 perform nude dances. First, in addition to imposing liability for Frehoo's customers having watched AP2 dance, BOLI also held Frehoo liable for hostile-working-environment sexual harassment based on customers touching or attempting to touch AP2 inappropriately. However, even assuming that BOLI correctly concluded, based exclusively on AP2's age, that being touched by customers was "unwelcome" within the meaning of OAR 839-005-0030(1)(b), BOLI again erred when it concluded that Frehoo "knew or should have known" of the touching conduct and failed to take "immediate and appropriate corrective action" considering "the extent of [Frehoo's] control and any legal responsibility [it] may have [had] with respect to the conduct" of its customers. OAR 839-005-0030(7). That is not to say that the evidence could not have supported a finding that Frehoo knew or should have known of the touching conduct, and I express no opinion in that regard.[7] However, as it had with regard to the watching

---

[7] As noted above, the majority's recounting of that evidence may slightly overstate its significance. Moreover, I am somewhat skeptical of BOLI's underlying reasoning (which is not set out in the majority opinion) that, because Frehoo had rules prohibiting touching and employed security to enforce them, Frehoo

conduct, BOLI's assessment of the touching conduct—and whether it had been sufficiently pervasive or severe to create a hostile working environment—focused entirely on AP2's age rather than on the problematic conduct. That is, BOLI's assessment of this theory of liability turned on the same "key inquiry" that BOLI had identified at the outset: whether Frehoo knew or should have known that AP2 was underage and whether it had taken adequate steps to safeguard against that harm, that is, employing underage dancers.

BOLI's final basis for holding Frehoo directly liable was the conduct of its employees—specifically its managers and security personnel—in watching AP2's nude audition and performances. As to that basis, BOLI expressly relied on the rationale it provided in connection with Frehoo's liability for its customers' conduct. Thus, for the same reasons that BOLI's order fails to correctly apply the law and provide substantial reason in support of its earlier conclusions, I would hold that BOLI erred in holding Frehoo directly liable for the conduct of its employees in watching AP2's nude performances.

In light of my conclusion under respondents' first assignment of error that BOLI's final order is deficient as to each of its bases for imposing principal liability on Frehoo, I would conclude that it is premature to address respondents' second and fourth assignments of error, asserting, respectively, that BOLI erred in imposing liability on an aid-and-abet theory and in its damages award. If, however, it is appropriate to address the legal question underlying respondents' second assignment of error at all, I believe that we must ourselves construe the statute at issue rather than remanding that task to BOLI. But because I would conclude that BOLI erred in imposing aid-and-abet liability under the facts of this case, I agree that it is appropriate to reverse and remand on that issue.

---

knew or had reason to know that AP2 was subject to customers violating those rules. Nonetheless, BOLI's unchallenged factual findings might provide plausible support for that aspect of the order under a proper application of the law, particularly given BOLI's observations that Frehoo's enforcement of its own rules and its efforts to ensure that its dancers had adequate resources to address violations were inconsistent at best.

For the foregoing reasons, I respectfully dissent as to the majority opinion's holding on the first assignment of error, but otherwise concur.